**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 13 |
| | ) | |
| Richard Johnson | ) | |
| Linda Johnson, | ) | Case No. 08-B-12062 |
| | ) | |
| Debtors. | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

This Chapter 13 case is before the court for ruling on the confirmation of the debtors' plan.  The standing trustee has objected to confirmation, arguing that the plan fails to devote all of the debtors' "disposable income" received during the applicable commitment period to the payment of unsecured claims, as required by § 1325(b) of the Bankruptcy Code (Title 11, U.S.C.).  The dispositive issue is whether "disposable income" under § 1325(b) must be calculated on the basis of the debtors' average income during the six months before bankruptcy, or whether debtors' post-bankruptcy income may be taken into consideration.

Many courts have addressed this issue with substantially conflicting results, but the best reading of the statutory language is that a debtor's post-bankruptcy income not only may be considered in determining disposable income, but should be the exclusive basis for doing so.  Because the debtors' plan in this case devotes more than the required amount of their post-bankruptcy income to payments of unsecured debt, the plan complies with § 1325(b) and will be confirmed over the trustee's objection.

**Jurisdiction**

Under 28 U.S.C. § 1334(a), the federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code, but 28 U.S.C. § 157(a) allows them to refer these cases to the bankruptcy judges for their districts. The District Court for the Northern District of Illinois has made such a reference of its bankruptcy cases. N.D. Ill. Internal Operating Procedure 15(a). Pursuant to this reference, a bankruptcy judge has jurisdiction under 28 U.S.C. § 157(b)(1) to "hear and determine . . . all core proceedings arising under title 11, or arising in a case under title 11." A proceeding regarding the confirmation of a Chapter 13 plan is a core proceeding. 28 U.S.C. § 157(b)(2)(L).

**Factual Background**

The relevant facts are not in dispute. Richard and Linda Johnson filed a Chapter 13 petition and plan on May 12, 2008. At the time, both of the Johnsons were working, and their combined gross monthly income was $13,500, which they reflected in Schedule I. (Docket No. 1.) In the Schedule J, the Johnsons calculated that after payroll deductions and their actual expenses, they had $3,705 per month in income that could be devoted to a Chapter 13 plan. (*Id.*) They submitted a plan that proposed monthly payments of almost all of this amount—$3,700—for sixty months, a total of $220,000, of which $162,000 would be paid to general unsecured creditors. (Docket No. 9.) [1]

---

[1] Other portions of the funds contributed under the plan would pay secured and priority creditors. The allowed general unsecured claims in this case total $221,291. The trustee mistakenly asserts that the plan limits payments to 60% of this amount (less than $133,000). Paragraph E.8 of the plan actually states that general unsecured claims will be paid "to the extent possible" from the $220,000 contribution specified in Section D of the plan, "but *not less than*

At the time they filed their petition, the Johnsons also filed Official Form 22C, the "means test" form, providing a different view of their income and expenses.  (Docket No. 7.)[2] Form 22C requires a statement of the average monthly income that debtors receive in the six calendar months before the filing of their bankruptcy cases.  During the six calendar months before the Johnsons filed their case—November 2007 through April 2008—Linda Johnson had received, in addition to her regular salary, workers compensation payments for a hand injury, but these payments stopped in April, before the bankruptcy filing.  (*See* Debtors' Response to Trustee's Objection, Docket No. 35, at 2.)  Including the workers compensation payments on Form 22C, as the form requires, the Johnsons reported average monthly income of $16,045.  (Docket No. 7, Line 57.)  The Johnsons then listed income deductions specified by Form 22C in a total amount of $11,505.  (*Id.*, Line 52.)  Finally, the Johnsons reported Form 22C "disposable income" (total income less deductions) as $4,540.  (*Id.,* Line 57.)

The trustee relied on this $4,540 figure as the sole basis for her objection to confirmation. (Docket No. 24.)  She argued that, under § 1326(b) of the Code, the Johnsons must either make sixty payments of $4,540—a total of $274,400—toward allowed unsecured claims, or else pay those debts in full.  Because the allowed general unsecured claims ($221,291) are less than that

---

60% of their allowed amount" (emphasis added).  The 60% figure is thus a floor, not a ceiling, and the plan in fact provides for payment of $162,000 toward general unsecured claims.

[2] Official bankruptcy forms, prescribed by the Judicial Conference of the United States, are required to be used "with alterations as may be appropriate."  Fed. R. Bankr. P. 9009.  The official forms and accompanying committee notes can be found on the website of the United States Courts, www.uscourts.gov/bkforms/bankruptcy_forms.html#official (last visited January 22, 2009).

amount, the trustee contended that full payment of these claims is required, rather than the

$162,000 that the Johnsons' plan proposes.

In response to the trustee's objection, the Johnsons amended Form 22C to reflect the in-

come they were receiving when they filed their bankruptcy case, which did not include any

workers compensation payments, instead of the six-month pre-filing average they originally re-

ported. (Docket No. 35, Ex. E.)  The amended form reflects disposable income of $1,995

monthly, substantially less than the $3,700 that the Johnsons' plan proposes to contribute.  The

amended monthly disposable income over sixty months would amount to $119,700.

The different calculations of available income can be set out in a table:

|  | Schedules I & J (post-filing income and actual expenses) | Original Form 22C (six-month pre-filing average income and means test expenses) | Amended Form 22C (post-filing income and means test expenses) |
|---|---|---|---|
| Income | $13,500 | $16,045 | $13,500 |
| Deductions | 9,795 | 11,505 | 11,505 |
| Disposable income | 3,705 | 4,540 | 1,995 |
| 60-month total | $222,300 | $272,400 | $119,700 |

The trustee has not contested the accuracy of any of the income or expense items re-

ported by the Johnsons.  She questions only their legal significance.

## Legal Analysis

Section 1325 of the Bankruptcy Code sets out the requirements for confirmation of a

Chapter 13 plan.  Among these is § 1325(b), a provision establishing minimum payments that a

plan must make on account of unsecured claims if an unsecured creditor or the trustee objects.

The text of § 1325(b) was substantially amended by the Bankruptcy Abuse Prevention and Con-

sumer Protection Act of 2005 ("BAPCPA").  As amended, § 1325(b) is extensive, exceeding 600

words. Its basic operation, however, is simple:

> (1) If an unsecured creditor or the trustee objects, then

> (2) the plan must either provide for the claim of the objecting creditor to be paid in full
>
>    [all claims if the trustee objects], or

> (3) the plan must provide for unsecured claims to be paid with "all of the debtor's pro-
>
>    jected disposable income to be received in the applicable commitment period beginning
>
>    on the date that the first payment is due under the plan."

The trustee has objected to the Johnsons' plan because, she asserts, it neither pays unse-

cured claims in full nor devotes to their payment "all of the debtor's projected disposable income

to be received in the applicable commitment period."

The question raised by the objection is how much the Johnsons must propose to pay to-

ward their unsecured claims under this requirement.  Two terms of art are directly involved:

"disposable income" and "applicable commitment period."  Each depends to some extent on an-

other term of art, "current monthly income," and so an understanding of current monthly income

is a first step in assessing the payments toward unsecured debt required by § 1325(b).

    1.  *Determining current monthly income*

"Current monthly income" is defined in § 101(10A) of the Code.  Under the definition,

"current monthly income" has three components: income inclusions, income exclusions, and a

computation period.

    • The income inclusions are

> (1) all income, both taxable and nontaxable, that the debtor receives;

(2) in a joint case, all income, both taxable and nontaxable, that the debtor's spouse receives; and

(3) all other amounts that are paid on a regular basis for the household expenses of the debtor, the debtor's dependents, and, in a joint case, the debtor's spouse if not otherwise a dependent.

• The income exclusions are

(1) benefits received under the Social Security Act;

(2) payments to victims of war crimes or crimes against humanity; and

(3) payments to victims of international or domestic terrorism.

• The computation period is

(1) the six calendar months before the bankruptcy filing if the debtor files a schedule of current income; or

(2) if the debtor does not file the schedule, six months before the court determines the amount of current monthly income.[3]

The definition requires the computation of a monthly average of the included income, less the excluded income, "derived during" the computation period.

---

[3] The second computation period will rarely, if ever, be applicable in Chapter 13. If the debtor does not file a schedule of current income (as required by § 521(a)(1)(B)(ii) unless the court orders otherwise) during the first forty-five days of the case, the case is automatically dismissed under § 521(i). *See In re Young*, No. 06-80397, 2006 WL 3524482, at *3 (Bankr. S.D. Tex. Dec. 6, 2006) (discussing the operation of § 521). For practical purposes, then, the computation period in the definition of current monthly income for Chapter 13 cases is the six calendar months before the case filing.

Several features of this definition are noteworthy. First, "current monthly income" is an artificial construct defined for a bankruptcy case rather than for an individual. It includes, for example, payments regularly made for the household expenses of the debtors' dependents even if these are gifts given directly to the dependents, and it includes the income of both debtors in a joint case. Thus, the income that an individual receives is only one element of the "current monthly income" for a bankruptcy case; "current monthly income" is not something that an individual can "have" or "receive." Second, the definition does not purport to measure the extent of the funds actually available to debtors. By excluding several sources of funding—such as social security benefits and irregular support payments—the definition assures that "current monthly income" in many bankruptcy cases will be substantially less than the funds actually available. Most notably, the definition departs from prior practice by excluding the income of a non-filing spouse to the extent that it is not regularly paid for the household expenses of the debtor or the debtor's dependents.[4] Third, the definition's distinction between "debtor" and "debtor's spouse" in a joint case conflicts with other provisions of the Code that treat both joint filers interchangeably as "debtors." *See e.g.,* 11 U.S.C. § 302(b) ("After the commencement of a joint case, the court shall determine the extent, if any, to which the debtors' estates shall be consolidated.").

---

[4] Under the pre-BAPCPA version of § 1325(b), courts generally considered all of a non-filing spouse's income in determining the "disposable income" available to a debtor. *See In re Charles*, 375 B.R. 338, 341 (Bankr. E.D. Tex. 2007) (collecting authorities).

With this understanding of "current monthly income," the two specialized terms used in § 1325(b)—"disposable income" received in the "applicable commitment period"—can be explored.

### 2. *Determining the applicable commitment period*

"Applicable commitment period" is defined in § 1325(b) itself. Section 1325(b)(4)(A)(i) provides that the period is generally three years, but § 1325(b)(4)(A)(ii) extends the period to five years if the "current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12" is at least equal to a specified median income based on the debtor's household size and state of residence.[5]

Section 1325(b)(4)'s use of current monthly income to determine the applicable commitment period creates a tension with the definition of current monthly income in § 101(10A). Section 1325(b)(4)(A)(ii) requires that the current monthly income of the debtor and the debtor's spouse be "combined." However, as noted above, § 101(10A) provides for only one "current monthly income" per case; under the definition, individuals do not have current monthly incomes that are capable of being combined. If a married debtor files individually, the only apparent way to combine current monthly incomes of the debtor and the debtor's spouse would be to calculate a current monthly income for each as though each had filed a separate bankruptcy case. That has the effect of including all of the income of each spouse for purposes of calculating the applicable

---

[5] The statute actually provides that the applicable commitment period for above-median income debtors is "not less than five years." However, an applicable commitment period of more than five years is not possible under § 1322(d), which states that a plan may not provide for payments over a period longer than five years.

commitment period, rather than only the income of the non-filing spouse regularly paid for the household expenses of the debtor and the debtor's dependents.[6]

Because of the tension between § 101(10A) and § 1325(b)(4) with respect to spousal current monthly income, it is not possible to give complete effect to both provisions in calculating the applicable commitment period for a married debtor filing individually. Official Form 22C attempts to honor the "combining" mandated in § 1325(b)(4) by requiring a statement of current monthly income from the non-filing spouse as though that spouse were in a separate bankruptcy case. Following the definition of current monthly income in § 101(10A), however, the form also allows the debtor to subtract a non-filing spouse's income to the extent that it is not regularly paid for the household expenses of the debtor and the debtor's dependents.[7]

---

[6]At least one Code provision— the "safe harbor" from the means test presumption in § 707(b)(7)—clearly requires a calculation of the "current monthly income" of a non-filing spouse, since it provides that the non-filing spouse's current monthly income should not be calculated in specified situations of marital separation. *See In re Welch*, 347 B.R. 247, 255 n.14 (Bankr. W.D. Mich. 2006) (observing that the income of a non-filing spouse is considered in determining the availability of the means test presumption).

[7] If the debtor makes this choice, the form will so indicate and a party in interest may argue that the full amount of the non-filing spouse's income is required to be counted under § 1325(b)(4). Nearly all reported decisions on this issue have held that because a non-filing spouse has no current monthly income under the definition in § 101(10A), only payments regularly made by the spouse for the household expenses of the debtor or the debtor's dependents should count as current monthly income for purposes of computing the applicable commitment period under § 1325(b)(4). *See In re Stansell*, 395 B.R. 457, 461-62 (Bankr. D. Idaho 2008); *In re Dugan*, No. 07-40899-13, 2008 WL 3558217 (Bankr. D. Kan., Aug. 12, 2008); *In re Borders*, No. 07-12450, 2008 WL 1925190 (Bankr. S.D. Ala., Apr. 30, 2008); *In re Grubbs*, No. 07-32822-KRH, 2007 WL 4418146 (Bankr. E.D. Va., Dec. 14, 2007); *In re Quarterman*, 342 B.R. 647 (Bankr. M.D. Fla. 2006). *But see In re Beasley*, 342 B.R. 280 (Bankr. C.D. Ill. 2006) (entire "current monthly income" of a non-filing spouse included in determining applicable commitment period).

In joint cases, like the Johnsons' case, Form 22C requires that each spouse report separately the items included in the definition of current monthly income in § 101(10A) and then combine the results, pursuant to § 1325(b)(4)(A)(ii).  This application of § 1325(b) to joint cases does not appear to have been challenged, and the Johnsons completed Form 22C—in both their original and amended filings—by listing the income items applicable to each of them.  The difference between the two submitted forms is the period for computation.  Originally, the Johnsons reported their average income for the six calendar months preceding their bankruptcy case, as required by the form, consistent with the definition of current monthly income in § 101(10A).  In their amended filing, they reported the monthly income that they were receiving at the time of the bankruptcy case and expected to receive thereafter.  (See Docket No. 1, Schedule I, Line 17.)  For purposes of the applicable commitment period, however, there is no difference between the two forms—each produces a current monthly income in excess of the median family income in Illinois for a family the size of the Johnsons' household.[8]  Their applicable commitment period is therefore five years, a conclusion not in dispute.

3. *Determining disposable income*

The remaining term to be examined is "disposable income," which—to the extent that it is "projected . . . to be received in the applicable commitment period"—must be used to pay un-

---

[8] The Johnsons' original Form 22C declared current monthly income of $16,045, producing an annual income of $192,540.  The amended Form 22C declared current monthly income of $13,500, or $162,000 annually.  The Johnsons have a household of four.  The annual median income for a family of four in Illinois at the time of the Johnsons' bankruptcy filing was $77,644. See Census Bureau Median Family Income by Family Size, reported at http://www.usdoj.gov/ust/eo/bapcpa/20080317/bci_data/median_income_table.htm (last visited January 23, 2009).

secured claims pursuant to § 1325(b).  "Disposable income" is defined in paragraphs (2)-(3) of

§ 1325(b).  The definition can be summarized as follows:

> (1) Disposable income is "current monthly income received by the debtor,"

> (2) subject to additional income exclusions for child support payments, foster care pay-
> ments, and disability payments for a dependent child,

> (3) less expenditures necessary for the support of the debtor or a dependent of the
> debtor, for domestic support obligations, for charitable contributions, and for business
> operations,

> (4) with these necessary expenditures, except for charitable contributions, "determined in
> accordance with subparagraphs (A) and (B) of section 707(b)(2)"—the provisions de-
> fining the means test used in Chapter 7 bankruptcy cases—if the debtor's current
> monthly income is greater than the applicable median.

Most of the components of this definition can be applied to the Johnsons' case without

dispute.  Because the Johnsons' current monthly income is above the applicable median, their

necessary expenditures are determined under the means test.  And although § 1325(b)(2) refers to

current monthly income "received by the debtor," the Johnsons have not asserted that they can

exclude income received by the debtor's spouse; in their reporting they included income that both

of them received.  There is no question that their income and expense items have been properly

reported in conformity with the official form.

The sole dispute is over the period used to compute disposable income.  Invoking the

definition in § 101(10A), the trustee argues that the Johnsons' currently monthly income is fixed

at the monthly average for the six months before their bankruptcy case, and that the disposable

income their plan must devote to payments of unsecured debts is simply this current monthly

income, multiplied by the sixty months of their applicable commitment period, less necessary

expenditures under the means test.  In other words, the trustee takes the computation period for

disposable income to be the six months prior to bankruptcy.   The Johnsons, on the other hand,

contend that their disposable income must be based on the income that they actually anticipate

receiving during the applicable commitment period, making the period for computing disposable

income the five years after payments begin under their plan.

The question of how "disposable income" should be interpreted under the post-BAPCPA

version of § 1325(b) has been treated in scores of published decisions, including three by courts

of appeals. [9]  Most decisions adopt one of two approaches.  Each of these approaches, however,

accepts the six-month period before bankruptcy as at least the starting point for calculating pro-

jected disposable income.

a.  *The conclusive approach*

One approach, adopted by the Ninth Circuit in *Maney v. Kagenveama (In re Kagen-*

*veama),* 541 F.3d 868 (9th Cir. 2008), supports the trustee's position.  This approach makes the

six-month pre-bankruptcy period the conclusive basis for calculating disposable income under

§ 1325(b), simply multiplying the average income from that period by the number of months in

---

[9]  *In re Wilson*, 397 B.R. 299, 307-18 (Bankr. M.D.N.C. 2008), presents a collection of
over sixty decisions on the question.  The question has also divided bankruptcy courts in the
Seventh Circuit and in the Northern District of Illinois.  *Compare In re Nance*, 371 B.R. 358
(Bankr. S.D. Ill. 2007), and *In re Ross*, 375 B.R. 437 (Bankr. N.D. Ill. 2007) (measuring dispos-
able income based on income from the pre-filing period) *with In re Hilton*, 395 B.R. 433 (Bankr.
E.D. Wis. 2008) and *In re Demonica*, 345 B.R. 895, 900 (Bankr. N.D. Ill. 2006) (post-filing in-
come dispositive).

the applicable commitment period to generate the income from which necessary expenditures are subtracted to obtain disposable income.

The principal support for this "conclusive" application of the six-month pre-bankruptcy average income is the definition of disposable income in § 1325(b), which applies deductions for necessary expenditures to "current monthly income"—defined in § 101(10A) as income received during that six-month period. "Reading the statute as requiring 'disposable income,' as defined in subsection [1325](b)(2), to be projected out over the 'applicable commitment period' to derive the 'projected disposable income' amount is the most natural reading of the statute, and it is the one we adopt." *Id.* at 872.[10]

One difficulty with the conclusive approach is the unfortunate set of results it produces. Income received in the period *before* a bankruptcy filing will often be a poor measure of how much a debtor can pay to unsecured creditors *after* the bankruptcy filing. If a debtor's income has permanently declined as of the filing—like the Johnsons' income in the present case—it may be impossible for the debtor to make payments based on the pre-filing income. And if the debtor's income has permanently increased, payment based on the pre-filing income may be much lower than the debtor's actual income would allow. *See In re Hardacre,* 338 B.R. 718 (Bankr. N.D. Tex. 2006) (noting "the anomalous results that could occur by strictly adhering to section 101(10A)'s definition of 'current monthly income'"). Courts should be hesitant to accept

---

[10] *In re Alexander,* 344 B.R. 742, 749 (Bankr. E.D.N.C. 2006), a leading case for the conclusive approach, set out its reasoning this way: "What is now considered 'disposable' is based upon historical data—current monthly income derived from the six-month period preceding the bankruptcy filing. 11 U.S.C. § § 101(10A), 1325(b)(2). [I]n order to arrive at 'projected disposable income,' one simply takes the calculation mandated by § 1325(b)(2) and does the math."

statutory interpretations that seem to make no sense.  *See Griffin v. Oceanic Contractors, Inc.*,

458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are

to be avoided if alternative interpretations consistent with the legislative purpose are available.").

A more significant problem with the conclusive approach is that the language of § 1325(b)

itself does not align with a payment obligation based on pre-filing income.  Section 1325(b) re-

quires a debtor's plan to devote to payment of unsecured claims the "projected" disposable in-

come "to be received during the applicable commitment period beginning on the first date pay-

ment is due under the plan."  Several courts have noted that the word "projected"—which is not

defined in the Bankruptcy Code—implies a prediction of what is likely to occur in the future,

rather than a computation based on potentially outdated information from the past.  *See, e.g.,*

*Hildebrand v. Petro (In re Petro)*, 395 B.R. 369, 377 (B.A.P. 6th Cir. 2008) (observing that "the

word 'projected' is future oriented"); *In re Jass*, 340 B.R. 411, 415 (Bankr. D. Utah 2006) (not-

ing the dictionary definition of "projected").  One cannot "project" what has already happened.

Even more awkward for the conclusive approach is the directive to pay the disposable in-

come "to be received" during a particular future period—"the applicable commitment period be-

ginning on the date that the first payment is due under the plan."  If § 1325(b) simply required

the payment of a multiple of past monthly income, there would be no point in specifying a par-

ticular future period in which income was anticipated to be received.  The date the case was filed,

the date the plan was confirmed, or even the date of the debtor's next birthday would produce

exactly the same result under the conclusive approach as would an applicable commitment period

beginning on the date the first payment was to be made under the plan.  Specifying a particular

period only matters if events that occur during that period are relevant.

14

Finally, as noted above, "current monthly income" is only the starting point in determining "disposable income." Section 1325(b)(2) directs that the necessary expenses of maintaining the debtor's household, paying support obligations, making charitable contributions, and generating income must be deducted from "current monthly income" to derive the "disposable income" that that a plan must pay out. Like income, these expense items are subject to change over time.[11] But nothing in § 1326(b) or the definition of current monthly income suggests that expenses should be assessed and averaged for a pre-filing period. To the contrary, § 1325(b)(2)(A)(i) expressly provides for the deduction of a support obligation "that first becomes payable after the date the petition is filed," thus requiring that this expense item be measured on a post-filing basis and strongly suggesting that expenses generally are to be measured on that basis. Yet if the expenses that offset income are to be assessed post-filing, it is difficult to see how the income being offset would not likewise be assessed post-filing.

    b. *The presumptive approach*

    The other major approach to calculating disposable income under § 1325(b), accepted by the Eighth and Tenth Circuits, responds to the practical difficulties caused by the use of pre-filing income in the definition of current monthly income. *See Coop v. Frederickson (In re Frederickson)*, 545 F.3d 652 (8th Cir. 2008)*; Hamilton v. Lanning (In re Lanning)*, 545 F.3d 1269, 1282 (10th Cir. 2008). Under this approach, the definition's six-month pre-filing average income is only "a starting point"; if a debtor's income has substantially changed, or if it is antici-

---

[11] Perhaps most obviously, expenses change with the number of dependents for whom a debtor is responsible. A debtor will have higher expenses after the birth or adoption of a child; a debtor will have lower expenses after a formerly dependent child becomes self-sufficient. Similar changes in expenses will occur with fluctuations in the debtor's housing and transportation costs.

pated to change from the pre-filing average, a correction can be made. *See Frederickson*, 545 F.3d at 659 (adopting the view that "a debtor's 'disposable income'. . . is a starting point for determining the debtor's 'projected disposable income,' but that the final calculation can take into consideration changes that have occurred in the debtor's financial circumstances"); *Lanning*, 545 F.3d at 1282 (holding that "a Chapter 13 debtor's 'projected disposable income' is presumed to be the debtor's 'current monthly income,' as defined in . . . § 101(10A)(A)(i), subject to a showing of a substantial change in circumstances").

The primary problem with the presumptive approach is the statutory language. Nothing in § 1325(b) creates or implies a presumption of correctness in the average income from the six months before bankruptcy. This absence is particularly telling because the means test in § 707(b)(2), which § 1325(b) uses to determine the necessary-expenditure component of disposable income for higher income debtors, is itself an elaborate mechanism for determining a presumption of debt-paying ability, with the facts necessary to rebut the presumption specified in § 707(b)(2)(B). For this reason, the Ninth Circuit observed that "Congress knows how to create a presumption" when one is intended. *Kagenveama*, 541 F.3d at 874.

Moreover, an approach making the definition of disposable income in § 1325(b) merely presumptive necessarily expands judicial discretion regarding debtors' plan payments in Chapter 13. Discretion would be have to be exercised in deciding both the facts that would rebut the presumption and the rules (if any) that would replace the statutory definition when the presumption has been rebutted. A grant of such discretion, however, is not easily located in BAPCPA. The court in *Musselman v. eCast Settlement Corp.*, 394 B.R. 801, 812 (E.D.N.C. 2008), noted the difficulty:

Beyond ensuring greater payouts by Chapter 13 debtors to their creditors, Congress, in its amendments to § 1325(b), also sought to impose objective standards on Chapter 13 determinations, thereby removing a degree of judicial flexibility in bankruptcy proceedings. Thus, . . . "[e]liminating flexibility was the point: the obligations of chapter 13 debtors would be subject to 'clear, defined standards,' no longer left 'to the whim of a judicial proceeding.' " *In re Farrar-Johnson*, 353 B.R. [224] at 231 [Bankr. N.D. Ill. 2006] (quoting Susan Jensen, A Legislative History of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 79 Am. Bankr. L.J. 485, 527 (2005)).

   c. *A harmonizing approach*

Both the conclusive and presumptive approaches to disposable income in § 1325(b) present substantial difficulties.  To address these difficulties, it is helpful to point out their source: a conflict between part of the definition of "current monthly income" in § 101(10A) and the use of "current monthly income" in § 1325(b)'s definition of "disposable income."  The definition in § 101(10A) computes "current monthly income" during a six-month period before the bankruptcy filing.  "Disposable income" in § 1325(b), on the other hand, requires payment of disposable income (defined as "current monthly income" less specified expenses) "projected . . . to be received" during an "applicable commitment period" beginning after the bankruptcy filing.  The two provisions are irreconcilable.  *See Kibbe v. Sumski (In re Kibbe)*, 361 B.R. 302, 312 (B.A.P. 1st Cir. 2007) (finding an irreconcilable conflict between the definition of "disposable income" and the prospective implication of "projected").

When statutory provisions conflict, a court's task—to the extent it can—is to give effect to both. *Morton v. Mancari,* 417 U.S. 535, 550 (1974) (stating that "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective").  Consistent with this rule, in calculating disposable income under § 1325(b), most of the content of § 101(10A) can be incorporated.  Its income

inclusions and exclusions can be given full effect.  However, to the extent that two statutory pro-

visions cannot be reconciled, the more specific governs the more general.  *Busic v. United States*,

446 U.S. 398, 406 (1980) (holding that "a more specific statute will be given precedence over a

more general one, regardless of their temporal sequence").  The specific provision of § 1325(b)(1)

regarding disposable income "to be received in the [post-filing] applicable commitment period"

must therefore be given precedence over the general definition of current monthly income in

§ 101(10A), which looks to income received pre-filing.[12]  The end result is a synthesis of

§§ 101(10A) and 1325(b) that measures the "current monthly income" inclusions and exclusions

of § 101(10A) projected to be received by the debtor during the applicable commitment period

defined by § 1325(b), reduced by the necessary expenditures incurred by the debtor during that

period.

This "harmonizing approach" honors the principle that statutory revisions should only

result in changes to established practices to the extent that the revisions clearly provide for

change. *See Finley v. United States*, 490 U.S. 545, 554 (1989) ("Under established canons of

statutory construction, 'it will not be inferred that Congress, in revising and consolidating the

laws, intended to change their effect unless such intention is clearly expressed.' ") (quoting *An-

derson v. Pacific Coast S.S. Co.*, 225 U.S. 187, 199 (1912)); *In re Wilson*, 397 B.R. 299, 312 n.20

(Bankr. M.D.N.C. 2008) (applying this principle to the interpretation of § 1325(b)).  Before the

---

[12] The computation period of § 101(10A) generally applies without difficulty.  It oper-
ates effectively in several substantive provisions of the Code other than the calculation of dis-
posable income under § 1325(b)—safe harbors from means testing in § 707(b)(6) and (7), deter-
mination of the applicable commitment period under § 1325(b)(4), and application of the means
test expense allowances under § 1325(b)(3).  Only in the specific situation of the disposable in-
come calculation of § 1325(b)(2) does a conflict arise.

enactment of BAPCPA, it was the established practice to "project" disposable income under

§ 1325(b) by looking to the income, net of necessary expenses, that the debtor actually antici-

pated receiving during the relevant post-filing period.  *See In re Briscoe*, 374 B.R. 1, 15 (Bankr.

D.C. 2007) (describing pre-BAPCPA practice**).**  By measuring income and expenses anticipated

to be received during the debtor's plan, the harmonizing approach continues this practice—one

that BAPCPA does not clearly contradict—but also honors the changes in the income inclusions

and exclusions that BAPCPA clearly specifies.

Other courts have adopted this harmonizing approach in interpreting § 1325(b) as

amended by BAPCPA.  *See In re Kibbe*, 361 B.R. at 314 (holding that "the income component of

'projected disposable income' as set forth in § 1325(b)(1)(B) is the anticipated actual income of

the Debtor," as defined by the income inclusions and exclusions of § 101(10A)); *In re Hardacre*,

338 B.R. 718, 723 (Bankr. N.D. Tex. 2006) (holding that "projected disposable income" under §

1325(b)(1)(B) necessarily refers to income that the debtor reasonably expects to receive during

the term of her plan, but that "Section 101(10A) continues to apply inasmuch as it describes the

sources of revenue that constitute income, as well as those that do not").

Further precedent for the harmonizing approach can be found in the way Official Form

22A resolves another conflict presented by the definition of current monthly income in

§ 101(10A).  As noted above, neither a debtor nor the debtor's spouse has "current monthly in-

come" under the definition, but § 707(b)(7) requires a combination of "the current monthly in-

come of the debtor . . . and the debtor's spouse."  The form reconciles these conflicting provi-

sions by requiring debtors to report the elements of the § 101(10A) definition that can be applied

to a non-filing spouse (the income inclusions and exclusions), while overriding the portions of the

definition that contradict the substantive provision.  See Official Form 22A, Lines 2c, 12-15.

Finally, the harmonizing approach avoids the problems inherent in both the conclusive

and presumptive uses of the six-month average pre-filing income.  In contrast to the presumptive

approach, there is no undefined expansion of judicial discretion.  In contrast to the conclusive

approach, there is no attempt to force the square peg of § 101(10A)'s computation period into

the round hole of § 1325(b)'s applicable commitment period.

4. *Schedules and forms*

None of the forms and schedules that debtors are currently required to file provide the in-

formation needed to calculate disposable income received during the applicable commitment pe-

riod.  Official Form 22C provides for the reporting and calculation of current monthly income as

defined in § 101(10A).  *See* Official Forms 22A-22C 2005-2008 committee note, Part A (2008).

Accordingly, it directs debtors to report an average of income received during the six calendar

months before the bankruptcy filing.  *See* Official Form 22C, Lines 1-9.  For the calculation of

"necessary expenditures" prescribed by § 707(b)(2)—which § 1325(b)(3) employs to determine

the disposable income of debtors with above-median income—Form 22C gives no explicit in-

struction as to the relevant time frame.  However, its descriptions of each expense item are set

out in present tense, indicating that current, rather than future expenses should be disclosed.  *Id.,*

Lines 24-58.  The form makes no provision for reporting anticipated changes in either income or

expenses during the applicable commitment period.

Schedules I and J (Official Forms 6I and 6J)—the schedules of current income and current

expenditures required under § 521(a)(1)(B)(ii)—do require a disclosure of changes in the reported

information anticipated to occur after the schedule is filed.  However, these schedules are de-

signed to report the debtor's actual income and expenditures and therefore may vary substan-

tially from the income and expense calculations used in determining disposable income under

§ 1325(b).  Schedule I requires an "[e]stimate of average or projected monthly income at time case

filed," rather than during the six-month period before the case was filed, and it does not exclude

from income either Social Security benefits or irregularly received support payments.  Schedule J

requires a statement of the debtor's actual expenses, rather than the allowances specified in

§ 707(b)(2).

Accordingly, in order to report disposable income projected to be received during the ap-

plicable commitment period, a debtor must supplement Official Form 22C with a statement of

any changes in the "current monthly income" as reported in the form, and any changes in the ex-

penses allowed, anticipated to take place during the applicable commitment period.  In many

cases, of course, the information the form requires will not be anticipated to change, and no fur-

ther disclosure would be required.  But with debtors like the Johnsons, for whom a change in in-

come from the six-month period before the bankruptcy filing has already occurred, an adjustment

of disposable income as reported on the current form is essential.

5. *The Johnsons' plan*

The amended Form 22A that the Johnsons submitted effectively reports the disposable

income that they project to be received during their applicable commitment period.  It properly

omits the workers' compensation income that Mrs. Johnson received before the bankruptcy fil-

ing but will not receive during the applicable commitment period.  The Johnsons' Schedules I and

J report no anticipated changes in income or expenses for the year after these schedules were

filed, and there is no basis for assuming any changes thereafter.  Accordingly, $119,700, as re-flected in the amended form, is the projected disposable income to be received in the applicable commitment period.  The Johnsons' plan proposes to apply substantially more than this amount to make payments to unsecured creditors.  The plan therefore satisfies the disposable income re-quirement of § 1325(b), and the trustee's objection must be overruled.

### Conclusion

For the reasons set out above, the Johnsons' Chapter 13 plan will be confirmed over the trustee's objection.  A separate order will be entered to that effect.

Dated:  January 23, 2009

Eugene R. Wedoff
United States Bankruptcy Judge